UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CRIMINAL ACTION NO. |
| | ) | 05-10138-DPW |
| v. | ) | |
| | ) | |
| | ) | |
| LUIS MANUEL GONZALEZ-CALDERON, | ) | |
| Defendant. | ) | |
| | ) | |


MEMORANDUM
December 3, 2007


Luis Manuel Gonzalez-Calderon moved to suppress evidence seized as a result of his warrantless arrest and the contemporaneous search of his person during a traffic stop on March 18, 2005.  He also moved to suppress evidence discovered during the subsequent search of the Honda Accord he was driving, his home at 4325 Washington Street, and a black Honda Odyssey parked in the driveway of that building.  After I informed the parties orally following the evidentiary hearing on the suppression motion that I would deny the motion, Gonzalez-Calderon entered conditional pleas of guilty.  This Memorandum constitutes the written findings and conclusions for my resolution of the suppression motion.

## I.  FINDINGS OF FACT[1]

The investigation that led to the indictment in this case began in approximately August 2004.  Based on information developed from confidential sources and seizures of cocaine, investigators identified Leonel E. Guerra-Pimental as the leader of a cocaine distribution ring in the Boston area.

In February 2005, agents from the Drug Enforcement Agency ("DEA") in Boston began intercepting telephone calls to and from two of Guerra-Pimental's cellular telephones, pursuant to a Title III wiretap.  Following the initiation of wiretaps, Guerra-Pimental was intercepted on a daily basis talking on the telephone about the distribution of drugs and the collection of drug proceeds.  These intercepted calls revealed that Guerra-Pimental distributed cocaine and heroin in concert with a group of Dominican males, including his partner, Marcial Soto-Garcia, an associate, Roberto Tueni, and Fernando Hernandez Gonzalez, a runner who delivered cocaine and heroin and collected drug proceeds.

The investigation revealed that Guerra-Pimentel, Soto-Garcia, and Tueni often pooled their money together to obtain

---

[1]In these findings of fact, I identify certain of Gonzalez-Calderon's codefendants by the names under which they were indicted.  In doing so, I resolve as factual determinations, the identities of persons discussed in or conducting intercepted telephone calls.  In addition, I resolve the meanings of nickname, slang, code and elliptical references made by parties to those telephone conversations, as evidenced in the summaries--which I find to be accurate--of those conversations.

cocaine from various sources of supply.

## A.   Intercepted Calls Between Guerra-Pimental and Soto-Garcia Regarding "Gordo" as a Source of Supply

On March 4, 2005, at 3:44 p.m., Guerra-Pimental received a call from Soto-Garcia.  During the call, Soto-Garcia told Guerra-Pimental that Gordo[2] had called him.  Soto-Garcia said he was going to give Gordo $15,000 for a kilogram of cocaine.  Soto-Garcia further stated that Gordo told him that if they could not come up with all the money, they could give him a partial payment.

On March 6, 2005, at 7:34 p.m., Guerro-Pimental received an incoming call from Soto-Garcia who told Guerro-Pimental that they needed to take care of "El Gordo's thing" when he arrived. Guerro-Pimental said that he wanted to get four kilograms of cocaine.  Soto-Garcia reported that Gordo said he would arrive that day or early the next day.  Guerra-Pimental responded that he would wait for Gordo to call.  Soto-Garcia observed that with Gordo the price of a kilogram of cocaine would be cheaper than others.

---

[2] I use the nickname Gordo at this point in this narrative finding of facts to illustrate the nickname by which law enforcement officers were hearing references to a suspect, whom I ultimately find to be Gonzalez-Calderon, during successive intercepted telephone calls.  This nickname is often used by Spanish speakers to indicate an overweight individual.  I note also that among the interceptees on the wiretaps was another individual identified as "Gordo."  This individual, however, was not a drug supplier but rather a carpenter who apparently made concealed compartments for the drug distribution ring.

**B.    Intercepted Calls on March 9, 2005 Between Guerro-Pimental and Soto-Garcia Regarding a Delivery of Cocaine from Gordo**

During an intercepted call on March 9, 2005, at 9:55 a.m., Soto-Garcia told Guerro-Pimental that he would have to go over to 50 Pinehurst Street, Roslindale, a location associated with an earlier drug transaction on March 7, 2005, to finish organizing the money in order to have it ready when Gordo arrived.

Later that same day, during a call at 2:19 p.m., Guerro-Pimental asked Soto-Garcia about the quality of the cocaine. Soto-Garcia responded that it was good quality but needed to harden up.  Later in the conversation, Soto-Garcia assured Guerra-Pimental the cocaine Gordo brought was good quality and that he should not let go of Gordo as a supplier.

**C.    Law Enforcement Agents Seize Six Kilograms of Cocaine from Gonzalez-Calderon after he visits 50 Pinehurst Street on March 18, 2005**

**1.    The Arrangements for Gordo's Delivery of Cocaine**

On March 18, 2005, at 12:20 p.m., Guerra-Pimental called Soto-Garcia.  During the intercepted call, Soto-Garcia said that Gordo had left and that Soto-Garcia had given Gordo $25,000 for cocaine.  Guerra-Pimental then told Soto-Garcia to call Gordo and tell him that he needed to know for sure if he, Gordo, was coming that day.  At 12:32 p.m., Soto-Garcia called Guerra-Pimental back and told him that he had just spoken to Gordo and Gordo would be there at around 3:30 p.m.

At around 12:47 p.m., in a telephone conversation with

4

Tueni, Guerro-Pimental asked Tueni to lend him the $2,000 because
Guerra-Pimental was waiting for something at 3:30, referring to
the anticipated transaction with Gordo.  In a telephone
conversation at 12:52 p.m., Soto-Garcia told Guerro-Pimental that
Gordo was owed $22,500.

Meanwhile, law enforcement agents from the DEA and the
Boston Police Department ("BPD") had the area around 50 Pinehurst
Street under surveillance.  At 3:54 p.m., Gonzalez-Hernandez
called Guerra-Pimental and told him that a customer wanted some
cocaine.  Guerra-Pimental said that he was on his way to see
Gordo and that the cocaine would be there in an hour.  During an
intercepted call at 4:11 p.m., Gonzalez Hernandez asked Guerra-
Pimental if he had already met with Gordo.  Guerra-Pimental said
that he was about to leave to go over to 50 Pinehurst Street to
receive the cocaine.

**2.   Gordo's (Gonzalez-Calderon's) First Visit**

At approximately 4:30 p.m., BPD Officer Robert Walsh
observed Soto-Garcia and Guerra-Pimental get out of a car parked
on Haslet Street and enter 50 Pinehurst Street.  About fifteen
minutes later, Officer Walsh observed a Honda Odyssey arrive and
park on Haslet Street near 50 Pinehurst Street.  Officer Walsh
observed an Hispanic man get out of the Honda Odyssey and enter
50 Pinehurst Street.  I find Gonzalez-Calderon, a heavy-set
Hispanic man, to be the Gordo referred to in the intercepted

conversations reported above.  Officer Walsh saw Gonzalez-Calderon carrying a black backpack having contents appearing to be of some substantial weight.

Five to ten minutes later, Officer Walsh saw Gonzalez-Calderon exit 50 Pinehurst Street carrying the same black backpack over the same shoulder and return to the Honda Odyssey. Officer Walsh observed that the black backpack appeared to the less fully weighted than it had just minutes before when Gonzalez-Calderon entered the building.  After getting back into the Honda Odyssey, Gonzalez-Calderon departed the area.

### 3.   Gordo (Gonzalez-Calderon) Returns

During an intercepted call at 5:34 p.m., a Hispanic male identified as Selman asked Guerro-Pimental if he was set up. Guerro-Pimental said he got "some things" that day, but that the quality was not too good so he was going to exchange them with "the guy."  I find this to be a reference to the drug transaction with Gonzalez-Calderon at 50 Pinehurst Street about an hour earlier.

At approximately 6:00 p.m., Officer Walsh saw Gonzalez-Calderon walk down Haslet Street, turn onto Pinehurst Street carrying a large, multi-colored, weighted shopping bag, and enter 50 Pinehurst Street.  Around five to ten minutes later, Officer Walsh observed Gonzalez-Calderon leave 50 Pinehurst Street carrying a large, white, weighted shopping bag and walk down

Haslet Street toward Roslindale Avenue.  Gonzalez-Calderon got into an unoccupied Honda Accord on Haslet Street carrying the shopping bag.

### 4.   Gonzalez-Calderon's Arrest

Officers followed the Honda Accord as it drove away until it was parked a few minutes later on Washington Street.  As officers approached Gonzalez-Calderon after he left the vehicle, Officer Walsh observed the white bag, over the multicolored bag that Gonzalez-Calderon had been carrying earlier, in the front passenger floor of the car.  Through the car's side window, Officer Walsh could see a portion of a square package wrapped in a gray duct tape.  The package was inside the open white plastic bag.  Office Walsh identified the packaging as that often used by drug distributers for kilogram packages of cocaine.

Officer Walsh then opened the car door and retrieved the white bag from the passenger-side floor.  Six similar packages were recovered from the white plastic bag, each containing a kilogram package consistent with cocaine.  Agents placed Gonzalez-Calderon under arrest.

Upon arrest, Gonzalez-Calderon identified himself as Rafael Jimenez.  He was later identified as Gonzalez-Calderon.

**D.   Searches of the Second Floor of 4325 Washington Street, Roslindale, and the Honda Odyssey Van; and the Seizures of One Kilogram of Cocaine and Approximately $22,000**

Following the arrest of Gonzalez-Calderon, agents located, in the area of 4235 Washington Street in Roslindale, the Honda Odyssey he was observed driving earlier that day to 50 Pinehurst Street.  Special Agent ("SA") Tully activated the remote on a set of keys seized earlier from Gonzalez-Calderon during his arrest. These activated the Odyssey's lights and alarm.

At this point, officers observed a female look out the window from the second floor apartment of 4325 Washington Street. Officers went to this second floor apartment, knocked on the door, and identified themselves as the police.  The female who been observed in the window identified herself as Yina Rodriguez. Ms. Rodriguez was shown a picture of Gonzalez-Calderon, and she identified him as her boyfriend.  Ms. Rodriguez stated that her boyfriend "sometimes" stayed there.  Ms. Rodriguez further stated that the Honda Odyssey parked outside, which was registered in her name, belonged to her.

Thereafter, agents obtained written consent from Ms. Rodriguez to search the apartment and the van for drugs and/or guns.  In the rear hallway of the apartment, a kilogram of cocaine in brown tape was found resting on top of some paint cans.

Inside the apartment, two pay stubs were seized in the name of Rafael Jimenez, the name that Gonzalez-Calderon falsely provided upon arrest, and a photo card in the name Luis Manuel Gonzalez-Calderon, depicting Gonzalez-Calderon, was also seized.

Inside the Honda Odyssey, agents seized a black plastic bag containing approximately $22,000 in cash.

## II.   CONCLUSIONS OF LAW

A judicially fashioned exclusionary rule prohibits introduction into evidence of tangible items seized during an unlawful search as well as derivative evidence that is acquired as a result of the unlawful search.  *Murray v. United States*, 487 U.S. 533, 537-38 (1988).  Gonzalez-Calderon contended that his arrest was unlawful because the agents lacked probable cause.  As a result, he requested that all materials seized during the arrest and contemporaneous search of his person be suppressed. He also claimed that items seized during the subsequent searches of the Honda Accord he was driving, the apartment at 4325 Washington Street, and the Honda Odyssey were "fruits" of the unlawful seizures during his improper arrest and should also be suppressed.

## A.   The arrest

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  To this end, a warrantless arrest must be based upon probable cause.  *United States v. Watson*, 423 U.S. 411, 417 (1976).

"Probable cause" is a "commonsense, nontechnical concept[]" that deals with the "factual and practical considerations of

everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). Probable cause exists where "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Id*. at 696.  In making this determination, a court must consider the totality of the circumstances.  *Gates*, 462 U.S. at 232, 238. The principal components of this analysis are "the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer," amount to probable cause. *Ornelas*, 517 U.S. at 696.

The facts I have found demonstrate that the officers had probable cause to arrest Gonzalez-Caldron.  Based on telephone interceptions, investigators believed that Soto-Garcia was expecting a delivery of cocaine from a cocaine supplier identified as Gordo at 50 Pinehurst Street on the afternoon of March 18, 2005.  This belief was reasonably shaped by information gathered since August 2004, when law enforcement agents first began investigating the cocaine distribution ring led by Guerra-Pimantal.  Beginning on February 17, 2005, investigators began intercepting calls from Guerra-Pimental's cell phones on a daily basis.  The wiretaps revealed that Soto-Garcia, Tueni and

Gonzalez-Hernandez, among others, were involved with Guerra-Pimental in purchasing and selling cocaine.  Those wiretaps began in March reflecting the involvement of Gordo as a source of desirable high-quality, lower priced cocaine.

On the day of the arrest, investigators had intercepted a series of calls during which Guerro-Pimental, Soto-Garcia and Tueni discussed a drug transaction with Gordo.  At 12:20 p.m., Soto-Garcia told Guerro-Pimental that he gave $25,000 to Gordo for cocaine and that Gordo was in a rush and would be back later. At 12:32 p.m., Soto Garcia told Guerro-Pimental that he had just spoken to Gordo and Gordo would be at 50 Pinehurst Street around 3:30 p.m.  At 12:47 p.m., Guerro-Pimental asked Tueni to lend him money because Guerro-Pimental was expecting cocaine from Gordo at 3:30 p.m.

Based on these calls, law enforcement agents established surveillance at 50 Pinehurst Street.  At 3:30 p.m., Guerro-Pimental told Tueni that he was still waiting for Gordo.  At 3:54 p.m., Guerro-Pimental told Gonzalez-Hernandez that he was on his way to see Gordo and the cocaine would be there in an hour.  At 4:11 p.m., Gonzalez-Hernandez asked Guerro-Pimental if he had met with Gordo, and Guerro-Pimental responded that he was going over them to receive the cocaine.  Agents observed Guerro-Pimental and Soto-Garcia arrive at 50 Pinehurst Street in the black Toyota Camry at 4:30 p.m.

At 4:45 p.m., Officer Walsh observed Gonzalez-Calderon

arrive at 50 Pinehurst Street in a black Honda Odyssey carrying a black backpack that appeared to have a certain weight to it. Five to ten minutes later, Gonzalez-Calderon was observed leaving 50 Pinehurst and departing in the Honda Odyssey.  He was carrying the same backpack, but it appeared to carry less weight.

At 5:34 p.m., Guerro-Pimental told his associates that he had received some cocaine, but it was poor quality and he was going to exchange it with "the guy."  At 6:00, Officer Walsh observed Gonzalez-Calderon return to 50 Pinehurst Street, this time with a multi-colored shopping bag, again appearing to have a certain weight to its contents.  Gonzalez-Calderon emerged from 50 Pinehurst Street about five to ten minutes later carrying the shopping bag which seemed to have contents of the same dimension and weight as when he had entered.  He got into a Honda Accord parked nearby and was followed by officers.  When Officer Walsh approached the car ten minutes later after it was parked, Officer Walsh saw in plain view a square package wrapped in duct tape he recognized packaging typical for a kilogram of cocaine.  Officer Walsh then opened the car door and retrieved the white bag that he had seen Gonzalez-Calderon carrying earlier.  Inside were six packages similar to the one that had been observed from outside the car.  At this point, Gonzalez-Calderon was placed under arrest.

Viewed from the standpoint of an objectively reasonable law enforcement agent, the facts recited above provide ample cause to

believe that Gonzalez-Calderon had committed a crime and that
contraband would be found in his car.  Gonzalez-Calderon
initially arrived outside a home where a drug transaction was
expected to take place, within minutes of the time when a cocaine
delivery was expected.[3]  He carried a weighted bag into the home,
and left with a lighter bag, suggesting that cocaine had been
delivered.  After Guerro-Pimental, the self-described recipient
of the cocaine, expressed himself as dissatisfied and wanting to
exchange the drugs, Gonzalez-Calderon returned to the house,
again carrying a weighted bag and left with a weighted bag,
suggesting cocaine had been exchanged.  In the car Gonzalez-
Calderon had been driving, an officer observed a package in plain
view which he recognized as of the type used for kilograms of
cocaine.  The agents in this case could reasonably infer from
these circumstances and their knowledge of drug activity by
Guerro-Pimental Soto-Garcia, Gonzalez Hernandez and Tueni over
the prior several months, that the Gordo referenced in the
intercepted telephone calls was Gonzalez-Calderon, that the bags
he carried in and out of 50 Pinehurst Street contained cocaine,
and that cocaine would be found in his car.

Gonzalez-Calderon argued that at the time of his arrest, he
was not a target of the investigation.  He observed correctly

_____

[3]Although Guerro-Pimental first expected Gordo to arrive at
3:30, at 3:54 p.m., Guerro-Pimental later told Gonzalez-Hernandez
that he expected Gordo in an hour (4:54 p.m.).

13

that: his voice had not been recorded during any of the
intercepted calls; that he had not previously been observed by
the police; that no confidential informant provided information
about him; and that no prior purchases had been made from him.
The fact that the officers had not previously identified
Gonzalez-Calderon as having a role in Guerra-Pimental's cocaine
distribution ring, however, does not preclude a finding of
probable cause.  Gonzalez-Calderon's own behavior on March 18,
2005 and the suspicious package in plain view in his car, when
placed in context by the information that the officers had
previously gathered with respect to Guerro-Pimental, Soto-Garcia,
Gonzalez-Hernandez and Tueni were sufficient to establish
probable cause.

Gonzalez-Calderon contended that his behavior on March 19,
2005, was not exclusive to drug dealing.  To be sure, in the
abstract, walking to and from a residence while carrying a
weighted bag does not suggest illicit activity.  But, that is not
all that happened here.  Gonzalez-Calderon arrived more or less
as scheduled at a house where a drug transaction was expected to
take place, carrying a weighted bag in and exiting with a lighter
bag.  He then returned after the recipient had determined the
drugs to be unacceptable.  He carried a weighted bag in and out,
consistent with an exchange of the drugs.  And importantly, a
package wrapped in typical cocaine packaging was observed in
plain view in his car.

Finally, Gonzalez-Calderon argued that even if he were Gordo, there was no reason to suspect that he would have had contraband on him once the drop-off was complete.  However, by the time he left the house at 6:10 p.m., agents had reason to suspect that Gonzalez-Calderon had merely exchanged one delivery of cocaine for another.  This, in addition to the package in plain view in his car, gave the agents sufficient reason to conclude that Gonzalez-Calderon was in possession of contraband.

In sum, the facts and circumstances establish that law enforcement agents had probable cause to arrest Gonzalez-Calderon.

## B.   The Honda Accord, the apartment, and the Honda Odyssey

Following the arrest, officers recovered six packages of cocaine, a scale, and documents from the Honda Accord that he had been driving.  During the later consent search of the apartment at 4325 Washington Street, they discovered another kilogram of cocaine, two pay stubs in the name of Rafael Jimenez (the name that Gonzalez-Calderon had given officers upon his arrest), and a photo card in the name of Luis Manuel Gonzalez-Calderon.  Among the items the agents seized during the arrest of Gonzalez-Calderon was a set of keys.  These keys unlocked the Honda Odyssey that Gonzalez-Calderon had been driving during his 4:30 p.m. visit to 50 Pinehurst.  Inside the Honda Odyssey, agents located a black nylon backpack and a black plastic bag containing

approximately $22,000 in cash.  Gonzalez-Calderon also moved to suppress these items as fruits of an illegal arrest.

Because there was probable cause for the predicate arrest, Gonzalez-Calderon's "fruit of the poisonous tree" theory of suppression withers.  *See United States v. Fiasconaro*, 315 F.3d 28, 37 (1st Cir. 2002) ("It is . . . well established that the defendant's lawful arrest permits the police to search his person and the passenger compartment of his vehicle.").  Probable cause arising from the arrest led appropriately to searches of the Honda Accord, the apartment, and the Honda Odyssey.

With respect to the Honda Accord, it is well-settled that under the automobile exception, police do not need a warrant to search an automobile and containers located inside it when they have probable cause to believe that contraband or evidence will be found.  *California v. Acevedo*, 500 U.S. 565, 573 (1991).  As the above discussion demonstrates, officers had reason to suspect that drug transactions had taken place at 50 Pinehurst Street in the afternoon and early evening of March 18, 2005, and that Gonzalez-Calderon had been carrying rejected drugs to and from 50 Pinehurst Street in the Honda Accord.  The officers saw a package that they immediately recognized as of the type used for cocaine plainly visible inside the Honda Accord.  The officers clearly had probable cause to search the vehicle.  Even without seeing the cocaine inside the car, the totality of the circumstances--

16

observing Gonzalez-Calderon carrying a weighted bag out of his
car and returning with another weighted bag when intercepted
communications revealed that a drug exchange was about to take
place--indicated that contraband was likely to be found inside
the car, and therefore, probable cause existed for the search of
the Honda Accord and the fruits of that search were not subject
to exclusion.

As for the apartment and the Honda Odyssey, Gonzalez-
Calderon does not appear to contest that law enforcement agents
properly obtained Ms. Rodriguez's written consent to search the
apartment and the car, which was registered in her name.
Gonzalez-Calderon, in any event, had no standing to contest those
searches.  The items discovered in the apartment and the Odyssey
were not subject to exclusion.

### III.  CONCLUSION

For the reasons set forth more fully above, I DENIED
Defendant's motion to suppress.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE